## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENY PETIT-FRERE, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| ) | |
| ACHILLION PHARMACEUTICALS INC., ) | |
| JOSEPH TRUITT, NICOLE VITULLO, ) | |
| JASON S. FISHERMAN, KURT GRAVES, ) | |
| MICHAEL D. KISHBAUCH, DAVID ) | |
| SCHEER, ROBERT L. VAN NOSTRAND, and ) | |
| FRANK VERWIEL, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Keny Petit-Frere, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Achillion Pharmaceuticals, Inc. ("Achillion" or the "Company")  and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Achillion, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Achillion by Alexion Pharmaceuticals, Inc. ("Parent" or "Alexion"), and Beagle Merger Sub, Inc., a wholly-owned subsidiary of Alexion ("Merger Sub").

1

2.     On October 16, 2019, Achillion and Alexion announced that they had entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Merger Sub would merge with and into Achillion, with Achillion continuing as the surviving corporation and a wholly owned subsidiary of Alexion (the "Proposed Transaction").

3.     Pursuant to the terms of the Merger Agreement, Achillion's shareholders will be entitled to receive (i) $6.30 in cash (the "Cash Merger Consideration"), and (ii) one contractual contingent value right pursuant to the CVR agreement, payable if certain clinical and regulatory milestones are achieved within specified periods (a "CVR" and together with the Cash Merger Consideration, the "Merger Consideration").

4.     On November 5, 2019, in order to convince Achillion's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

5.     In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Achillion's financial advisors, Centerview Partners LLC ("Centerview" or the "Financial Advisors") regarding the Proposed Transaction.

6.     The Proposed Transaction is expected to close in the first half of 2020 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff

seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Achillion's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.   "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).   "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.   Indeed, Achillion's common stock trades on the Nasdaq Global Select Market ("Nasdaq"), which is headquartered in this District.   *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

11.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Achillion common stock.

12.    Defendant Achillion is a public company incorporated under the laws of Delaware with principal executive offices located at 1777 Sentry Parkway West, VEVA Building # 14 Suite 200, Blue Bell, Pennsylvania 19422.  Achillion's common stock is traded on the Nasdaq under the ticker symbol "ACHN."

13.    Defendant Joseph Truitt ("Truitt") is, and has been at all relevant times, the Company's Chief Executive Officer ("CEO") and a director of the Company.

14.    Defendant Nicole Vitullo ("Vitullo") is, and has been at all relevant times, a director of the Company.

15.    Defendant Jason S. Fisherman ("Fisherman") is, and has been at all relevant times, a director of the Company.

16.    Defendant Kurt Graves ("Graves") is, and has been at all relevant times, a director of the Company.

17.    Defendant Michael D. Kishbauch ("Kishbauch") is, and has been at all relevant times, a director of the Company.

18.    Defendant David Scheer ("Scheer") is, and has been at all relevant times, a director of the Company.

19.    Defendant Robert L. Van Nostrand ("Van Nostrand") is, and has been at all relevant times, a director of the Company.

20.    Defendant Frank Verwiel ("Verwiel") is, and has been at all relevant times, a director of the Company.

21.    The Defendants identified in paragraphs 13 through 20 are collectively referred to

herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

22.     Achillion is a clinical-stage biopharmaceutical company focused on advancing its oral factor D inhibitors into late-stage development and commercialization.  Each of the product candidates in Achillion's factor D portfolio was discovered in its laboratories and is wholly owned by Achillion.  Achillion's product development is focused on completement-mediated diseases where there are no approved therapies or where significant unmet medical needs persist despite existing therapies.  Proxy, 1.

23.     Achillion was founded in 1998, began operations in 2000, and went public with its IPO on October 25, 2006.

24.     Since going public in 2006, Achillion has made great strides toward its stated objective of becoming a leading biopharmaceutical company through the discovery, development, and commercialization of small molecule therapies that specifically target the completement system to treat complement mediated disease.

25.     Indeed, on August 8, 2019, just two months before the Proposed Transaction was announced, Achillion issued a press release entitled *Achillion Reports Second Quarter 2019 Financial Results and Provides Corporate Update*, which affirmed the Company's current strategies and assured Achillion's investors that the Company continued to have excellent prospects:

> "We continued to advance our complement factor D inhibitors in the second quarter of 2019 by efficiently executing on our global development and regulatory strategies, while continuing to strengthen our intellectual property position. As we maintain discipline on our spending, we continue to increase our chemistry, manufacturing, and controls (CMC) capabilities in preparation for our expanding portfolio," said Joe Truitt, President and Chief Executive Officer at Achillion. "We believe our portfolio of oral factor D inhibitors has potential clinical benefits in multiple indications, and we look forward to initiating a clinical trial in a new indication in 2020, in addition to our Phase 3 clinical trial of

5

danicopan for paroxysmal nocturnal hemoglobinuria (PNH) in early 2020."

26.     Thus, the Proposed Transaction comes at a time when Achillion's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" Achillion's stockholders with consideration that fails to adequately compensate them for the intrinsic value of their shares.

27.     Despite Achillion's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out Achillion's stockholders and deprives them the ability to partake in Achillion's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

28.     On October 16, 2019, Achillion and Alexion issued a joint press release announcing the Proposed Transaction:

ALEXION TO ACQUIRE ACHILLION

- *Adds clinical-stage portfolio of oral small molecule Factor D inhibitors to Alexion's pipeline*

- *Provides opportunity to enhance treatment for PNH patients experiencing extravascular hemolysis (EVH), potential first-in-class C3 glomerulopathy (C3G) therapy & promising development platform for Factor D inhibition in additional alternative pathway complement-mediated rare diseases*

- *Initial all-cash transaction for $6.30 per share; total transaction of up to $8.30 per share with potential additional contingent considerations*

- *Conference call and webcast scheduled for today, October 16, 2019, at 8:00 a.m. EDT*

BOSTON & BLUE BELL, Pa.--(BUSINESS WIRE)--Oct. 16, 2019-- Alexion Pharmaceuticals, Inc. (NASDAQ:ALXN) and Achillion Pharmaceuticals, Inc. (NASDAQ:ACHN) today announced that they have entered into a definitive agreement for Alexion to acquire Achillion, a clinical-stage biopharmaceutical company focused on the development of oral small molecule Factor D inhibitors to treat people with complement alternative pathway-mediated rare diseases, such as paroxysmal nocturnal hemoglobinuria (PNH) and C3 glomerulopathy (C3G). Achillion currently has two clinical-stage medicines in development, including danicopan (ACH-4471) in Phase 2 and ACH-5228 in Phase 1.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20191016005257/en/

"Alexion has demonstrated the transformative impact that inhibiting C5 can have on multiple rare and devastating diseases. However, we believe this is just the beginning of what's possible with complement inhibition," said Ludwig Hantson, Ph.D., Chief Executive Officer of Alexion. "Targeting a different part of the complement system – the alternative pathway – by inhibiting Factor D production addresses uncontrolled complement activation further upstream in the complement cascade, and importantly, leaves the rest of the complement system intact, which is critical in maintaining the body's ability to fight infection. We believe this approach has the opportunity to help patients with diseases not currently addressed through C5 inhibition. We look forward to applying our nearly three decades of complement and development expertise to unlock the potential of oral Factor D inhibitors and bring these benefits to patients."

"We have established great momentum – discovering and advancing several small molecules into clinical development that have the potential to treat immune-related diseases associated with the alternative pathway of the complement system," said Joe Truitt, President and Chief Executive Officer at Achillion. "Having already demonstrated proof-of-concept and proof-of-mechanism with our lead candidate, danicopan (ACH-4471), in PNH and C3G, respectively, we believe there is significant opportunity for Factor D inhibition in the treatment of other diseases as well. Alexion is an established leader in developing medicines for complement-mediated diseases, and we look forward to working together to accelerate our objective of bringing novel therapies to patients as quickly as possible and ensuring that the broad promise of this approach is fully realized. We thank our employees, investigators and partners for their incredible work and commitment."

**Transaction Details**

The initial consideration of approximately $930 million, or $6.30 per share of Achillion common stock, will be funded with cash on hand. As part of the acquisition, Alexion will also be acquiring the cash currently on Achillion's balance sheet. As of September 30, 2019, this was approximately $230 million; the actual amount will be determined as of the transaction close. The transaction includes the potential for additional consideration in the form of non-tradeable contingent value rights (CVRs), which will be paid to Achillion shareholders if certain clinical and regulatory milestones are achieved within specified periods. These include $1.00 per share for the U.S. FDA approval of danicopan and $1.00 per share for ACH-5228 Phase 3 initiation.

Alexion's acquisition of Achillion is subject to the approval of Achillion shareholders and satisfaction of customary closing conditions and approval from relevant regulatory agencies, including clearance under the Hart-Scott Rodino Antitrust Improvements Act. Pending these approvals, the transaction is expected to close in the first half of 2020.

**The Preclusive Deal Protection Devices**

29.    To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

30.    Section 6.03 of the Merger Agreement is a restrictive "no-shop" provision that prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

31.    The Merger Agreement also requires the Board to provide Alexion with written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Alexion following Alexion's receipt of the notice, so that Alexion has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

32.    In addition, the Merger Agreement provides that the Company will be required to pay to Alexion a termination fee of $20,000,000.00 with respect to any termination under the no-shop provision.

33.    Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these

preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

34.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

35.     On or about November 5, 2019, in order to convince Achillion's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

36.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

37.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

38.     The Proxy states that Achillion entered into confidentiality agreement with standstill obligations not subject to a Don't Ask Don't Waive ("DADW") clause with Alexion and one other potential counterparty, but fails to disclose: (i) the identity of the potential counterparty other than Alexion with whom the Company executed a confidentiality agreement with standstill obligations, including whether that potential counterparty was Company A, Company B, or some other potential

counterparty that had expressed interest in acquiring Achillion, and (ii) whether the standstill obligations were subject to a "fall-away" clause so that they automatically terminated upon the announcement of the Proposed Transaction or otherwise must be waived by Achillion.

39.     The Proxy fails to disclose: (i) whether Company A and/or Company B explained why they were no longer interested in acquiring Achillion, and (ii) if so, what the substance of that explanation was.

**B.     The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

40.     The Proxy also omits material information that renders Centerview's Fairness Analysis materially misleading.

41.     The Proxy describes the Fairness Opinion and the various valuation analyses that Centerview performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and Centerview's potential conflicts of interest.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

42.     With respect to the Management Projections, the Proxy fails to provide all of the financial projections provided by management with regard to the fairness analyses for the following items: (i) net product revenues, (ii) net royalty revenues, (iii) costs of goods sold, (iv) research and development expenses, (v) sales and marketing expenses, (vi) general and administrative expenses,

(vii) taxes (or tax rate), (viii) stock-based compensation expense, (ix) adjusted depreciation & amortization, (x) capital expenditures, (xi) change in net working capital, and (xii) any other line items used in the calculation of unlevered free cash flow. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

43.     The Proxy also fails to disclose the financial projections that were prepared and discussed by the Board, Achillion management, and Centerview and relied upon for purposes of Centerview's "preliminary illustrative financial analyses" at the two-day Board meeting on September 26-27, 2019.

44.     Page 42 of the Proxy states that, on October 15, 2019, "management discussed with the Board of Directors the financial projections and the underlying assumptions and methodologies, including changes in such projections since the Board last reviewed the projections on September 26, 2019, as the result of further analysis by management of the potential market for Achillion's product candidates."  The Proxy fails to disclose: (i) the substance of that discussion, including any changes that were discussed relating to the underlying assumptions and methodologies, and (ii) how those changes affected the financial projections so that the final projections discussed on October 15, 2019 and included in the Proxy were different from the initial projections discussed and relied upon for the preliminary analyses on September 26-27, 2019.

45.     The Proxy also apparently contradicts itself with respect to when the projections were actually updated.  Indeed, Page 42 of the Proxy says that, on October 15, 2019, management discussed with the Board "changes in such projections since the Board last reviewed the projections on September 26, 2019," but Page 41 of the Proxy states that Achillion management, the Board, and

Centerview discussed these projections on October 1, 2019.

46.     It is impossible for the Company's public shareholders to cast an informed vote on the Proposed Transaction without knowing: (i) the initial financial projections, (ii) the nature and extent to which the initial financial projections were changed between September 26, 2019 and October 15, 2019, and (iii) the projected financial information omitted from the revised projections. *See, e.g., Azar v. Blount Int'l, Inc.*, No. 16-cv-483, 2017 U.S. Dist. LEXIS 39493, at \*11-25 (D. Or. Mar. 20, 2017).

47.     With respect to Centerview's *Selected Public Company Analysis* beginning on Page 51, the Proxy fails to explain why the specific Enterprise Values of other publicly traded companies should bear on its selected range of Enterprise Values of $250 million to $450 million.  Indeed, the method that Centerview employed in its *Selected Public Company Analysis* does not appear to rely at all on Centerview's valuation of other companies.  That Centerview managed to find a set of companies that happen to be smaller than Achillion does not mean that Achillion is itself smaller. Presenting the results alongside the valuations of the other selected companies is patently misleading because it suggests that the Enterprise Value derived for Achillion is somehow intrinsically linked to these enterprise valuations (including the median valuation).  Further, while the Proxy states that "Centerview selected a reference range of Enterprise Values of $250 million to $450 million" for the Company, it omits entirely the actual Enterprise Value that Centerview derived for Achillion consistent with the approach it employed in deriving the enterprise values of the selected companies.

48.     Regarding Centerview's *Selected Precedent Transactions Analysis* beginning on Page 51, the Proxy again fails to explain why the specific Transaction Values implied by other transactions should bear on its selected range of Transaction Values of $400 million to $925 million. Again, the method that Centerview employed in its *Selected Precedent Transaction Analysis* does not appear to actually rely at all on Centerview's valuation of other companies.  That Centerview managed

to find some transactions involving the acquisition of companies smaller than Achillion does not mean that Achillion is itself smaller.  Presenting the results alongside the transaction values implied by the other selected transactions is patently misleading because it suggests that the Enterprise Value derived for Achillion is somehow intrinsically linked to these transactions.

49.     With respect to Centerview's *Discounted Cash Flow Analysis*, ("DCF") beginning on Page 52, the Proxy fails to: (i) fully disclose Centerview's rationale and basis for selecting a discount rate range of 11.0% to 13.0%, (ii) fully disclose Centerview's rationale and basis for assuming "a rate of free cash flow decline year-over-year of 80.0%" after December 31, 2038, (iii) disclose whether Centerview assumed stock-based compensation would be treated as a cash- or non-cash expense, and (iv) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates.

50.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….*This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.

This raises a further dilemma in light of the conflicted nature of the investment
banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).

51.     Without the above-mentioned information, the Company's shareholders cannot: (i)
evaluate for themselves the reliability of the Discounted Cash Flow Analysis, (ii) make a meaningful
determination of whether the implied equity value ranges properly value the Company or were the
result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision
regarding whether to vote in favor of the Proposed Transaction.

52.     With respect to Centerview's analysis of stock price targets beginning on Page 53,
the Proxy fails to disclose the actual price targets themselves and/or any measurement of central
tendency with respect to those targets other than the range of price targets.

53.     With respect to Centerview's analysis of premiums paid in precedent transactions
beginning on Page 53, the Proxy fails to disclose: (i) the premium paid in each transaction, and (ii)
whether each selected transaction involved a cash- or stock-based merger.  Without this information,
it is impossible for the Company's public shareholders to know whether Centerview's applied range
of 50% to 70% premium relative to Achillion's closing stock price on October 15, 2019 properly
values the Company.

54.     If a Proxy discloses financial projections and valuation information, such projections
and valuations must be complete, accurate, and honest.  The question is not simply whether there is a
duty to speak, but also whether there may be liability for not having spoken enough.  With regard to
future events, uncertain figures, and other so-called soft information, a company may choose silence
or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See
Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths"
are actionable misrepresentations under securities laws and collecting cases).  Accordingly,
Defendants have disclosed some of the information related to the projections, assumptions, and inputs

relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

55.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

58.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not

false or misleading." 17 C.F.R. § 240.14a-9.

59.    The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

60.    Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

61.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

62.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details

surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

63.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

64.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

65.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

70.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

71.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

73.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 15, 2019                          **MONTEVERDE & ASSOCIATES PC**

                                                  By:   */s/ Juan E. Monteverde*
                                                  Juan E. Monteverde (JM-8169)
                                                  The Empire State Building
                                                  350 Fifth Avenue, Suite 4405
                                                  New York, NY 10118
                                                  Tel:(212) 971-1341
                                                  Fax:(212) 202-7880
                                                  Email: jmonteverde@monteverdelaw.com

                                                  *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com

*Attorneys for Plaintiff*